UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

ELIZABETH MAYS and ALESSANDRA
MALMQUIST,

           Plaintiffs,

   v.                                          CAUSE NO. 4:17-CV-48 DRL

RUBIANO, INC. and SHARON RUBIANO,

           Defendants.

## OPINION & ORDER

Elizabeth Mays and Alessandra Malmquist were "walk-in" exotic dancers at Danzers, an adult entertainment club owned by Rubiano, Inc. The company's president, Sharon Rubiano, terminated these performers for what they allege was protected activity under the Fair Labor Standards Act (FLSA). They both move for summary judgment on their claims for unpaid wages and retaliation damages under FLSA. Ms. Mays also moves for summary judgment on her claim under Indiana's blacklisting statute. The court now grants summary judgment in part.

## FACTUAL BACKGROUND

Danzers provides adult entertainment and sells snack food, beer, wine, and liquor purchased from wholesalers and retailers in Indiana to customers at its Indiana location. Elizabeth Mays and Alessandra Malmquist were exotic dancers at Danzers.

Danzers has two classifications of exotic dancers: "walk-in" dancers and employee dancers. Dancers begin in the "walk-in" classification, meaning they are not scheduled to work on specific days, may work on any day they wish, and may work at other clubs. When they work, they are expected to work six-hour shifts and fulfill the same roles and follow the same rules as employee dancers. Danzers has traditionally considered walk-in dancers to be independent contractors. If an adult entertainer

performs satisfactorily as a "walk-in" dancer, they are usually offered the opportunity to work as an employee on payroll.

Both Ms. Mays and Ms. Malmquist were classified as walk-in dancers. Ms. Mays worked nine total days at Danzers between January 17, 2017 through February 17, 2017. Ms. Malmquist worked 43 total days[1] at Danzers between July 18, 2016 until February 17, 2017, though there was a period when she didn't return to work for several months.

Back then, exotic dancers performed to music in one of two ways. On Friday and Saturday nights, the company hired a local DJ who selected the music to play. The DJ streamed his music through an online music streaming service, Napster, and YouTube. At all other times, a jukebox played music. The jukebox stored its music on an online database, which continually updated its music for customers. Customers could play the music on the jukebox through a mobile application (app). Some dancers texted their clientele to let them know that they would be working, and some used social media to advertise their performances.

On February 13, 2017, Ms. Rubiano received a letter from "Your Anonymous Dancers" that discussed Ms. Rubiano's alleged misclassification of dancers as independent contractors. In the letter, the anonymous dancers indicated that Ms. Rubiano misclassified them to avoid either paying the dancers or allowing the dancers to keep their own money. The letter accused Ms. Rubiano of violating various state and federal laws regarding payment. It indicated that if Ms. Rubiano didn't change her ways, the dancers would sue. Nothing in the record indicates who authored this letter.

During the month she worked as a walk-in dancer, Ms. Mays admitted that she broke the club's rules, including chewing gum, drinking on the job, and talking on her phone while on the floor after being asked to stop. Ms. Rubiano also accused her of being rude to customers and staff and said

---

[1] The parties cite to no evidence in the record for this exact number of days, though Rubiano cites to that number in their reply brief (*see* ECF 55 at 3).

2

she was involved in an incident when a customer complained about her putting a belt around his neck. Ms. Mays knew breaking the club's rules could lead to her termination.

Prior to terminating Ms. Mays, Ms. Rubiano ran a background check on her, which included calling other adult entertainment establishments. Ms. Rubiano also directed her grandson to research Ms. Mays on Google, and he pulled up approximately ten class action lawsuits in which Ms. Mays had sued her former employers for alleged violations of her rights. These suits included among others *Mays v. Midnite Dreams, Inc.*, 915 N.W.2d 71 (Neb. 2018) (FLSA claim) and *Mays v. Grand Daddy's, LLC*, 2015 U.S. Dist. LEXIS 91747 (W.D. Wis. July 15, 2015) (same). [2]

Ms. Rubiano met with Ms. Mays thereafter and told her she had sued lots of clubs in the past. She asked her, "what in the world are you doing? That's crazy." She expressed concern by saying it was unbelievable that Ms. Mays would sue that many clubs. She told Ms. Mays to backtrack and think about what she was doing because filing lawsuits was dangerous and crazy. She warned Ms. Mays about filing lawsuits because there were people who would hurt people that file lawsuits.

Ms. Rubiano met with Ms. Malmquist and told her that she was interacting with the wrong person by talking with Ms. Mays. Though Ms. Malmquist told Ms. Rubiano she didn't know that Ms. Mays sued clubs, Ms. Rubiano stated that Ms. Malmquist started talking to the wrong person and would be fired for affiliating with Ms. Mays. She told Ms. Malmquist she could get hurt if she tried to sue the wrong club, which she interpreted as a threat. Ms. Malmquist says she was terminated because she was seen talking to Ms. Mays and because the company didn't want Ms. Malmquist to help Ms. Mays with a case. Ms. Rubiano says she fired her for being on social media drinking with a minor.

On June 7, 2017, several months after both dancers were terminated, Ms. Mays and Ms. Malmquist sued Rubiano, Inc. and Ms. Rubiano, alleging wage violations under FLSA, retaliation, and

---

[2] The court takes judicial notice of the existence and nature of these lawsuits. Fed. R. Evid. 201(b)(2); *see Consolidation Coal Co. v. United Mine Workers of Am.*, 213 F.3d 404, 407 (7th Cir. 2000) (court can take judicial notice of judicial decisions).

blacklisting. They also moved to conditionally certify a class action under FLSA. Rubiano, Inc. and Ms. Rubiano both oppose conditional certification and move for summary judgment on all claims. The court held oral argument after the case's recent reassignment to this presiding judge.

## STANDARD

The court addresses summary judgment first because a ruling there may obviate conditional certification given the status of this case. Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

## ANALYSIS

A.   *The Dancers Cannot Recover Under FLSA.*

FLSA mandates "[e]very employer [to] pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise

4

engaged in commerce or in the production of goods for commerce, wages" specified by statute. 29 U.S.C. § 206(a). "Commerce" is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b). FLSA has two grounds for coverage: individual and enterprise. *See Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 295 n.8 (1985). If neither is met, FLSA doesn't apply. *Id.*

1. *These Two Dancers Were Employed by Rubiano, Inc.*

For FLSA to apply, a plaintiff must be an "employee." 29 U.S.C. § 206(a). An employee is one who, considering the "economic reality of the working relationship" under the totality of the circumstances, is "dependent upon the business to which they render service." *Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964 (7th Cir. 2018) (citing *Sec'y of Lab. V. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987)). The court considers the following list of non-dispositive factors: (1) the nature and degree of the alleged employer's control as to the manner in which work is performed; (2) the alleged employee's opportunity for profit or loss depending upon her managerial skill; (3) the alleged employee's investment in equipment or materials required for her task; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the employer's business. *Lauritzen*, 835 F.2d at 1534.

Here, the economic reality of Ms. Mays' and Ms. Malmquist's working relationship with Rubiano, Inc. made them employees as opposed to independent contractors. The first factor weighs in favor of employment because Ms. Mays and Ms. Malmquist were expected to comply with an extensive list of rules while working that go beyond what is normally asked of an independent contractor, though these two performers also had the freedom to select the days they worked shifts (*See* ECF 46-12 (rules and regulations of Danzers Showclub); ECF 46-14 (note regarding wearing heels on black chairs); ECF 46-15 (additional rules for dancers); ECF 46-16 (note regarding prohibition of

5

working on escort websites); ECF 46-17 (another rules note)). The company was primarily responsible for drawing customers to the club based on its managerial skill; and it controlled advertising, service location, business hours, facility maintenance, aesthetics, food, and beverages.

That said, given that some dancers texted clientele and advertised on social media, and some customers presumably showed up for particular dancers, this factor isn't entirely one-sided. As it worked, the dancers shared a role in drawing customers to the institution. The company expended most funds necessary to operate Danzers, and any costs incurred by Ms. Mays or Ms. Malmquist were minor or incidental, such as the cost for costumes or tipping employees. The parties concede that exotic dancing doesn't require any special skills, supporting employment. The short duration of the working relationship here supports a finding of independent contractor status. Lastly, exotic dancers are the essential ingredient for Danzers' business model, though the court won't downplay the importance of alcohol and food in drawing certain customers to the club.

In sum, though some factors weigh in favor of independent contractor status, the economic reality of the relationship here is one of employer-employee. In making this finding, the court joins a growing chorus of courts that have concluded likewise. *See, e.g.*, *Gilbo v. Agment, LLC*, 831 F. Appx. 772, 778 (6th Cir. 2020); *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 232 (3d Cir. 2019); *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 242 (4th Cir. 2016); *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 329 (5th Cir. 1993); *Hart v. Rick's Cabaret Intern., Inc.*, 967 F. Supp.2d 901, 922 (S.D.N.Y. 2013); *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp.2d 1326, 1350 (N.D. Ga. 2011); *Thompson v. Linda & A., Inc.*, 779 F. Supp.2d 139, 151 (D.D.C. 2011); *Morse v. Mer Corp.*, 2010 U.S. Dist. LEXIS 55636, 18 (S.D. Ind. June 4, 2010) (applying the *Lauritzen* factors); *Harrell v. Diamond A Ent.*, 992 F. Supp. 1343, 1353-54 (M.D. Fla. 1997).

2.   *These Dancers Aren't Individually Covered Under FLSA.*

Individual coverage occurs when an employee "engage[s] in commerce or in the production of goods for commerce." *See* 29 U.S.C. § 206(a). The court looks only to the acts of the employee, not

6

the employer. 29 U.S.C. § 206(a); *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959). The *employee* must be *engaged* in commerce, *see* 29 U.S.C. § 206(a); it isn't enough that her activities merely *affect* commerce. *Mitchell*, 358 U.S. at 211; *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943). For an employee's work to be engaged in commerce, her work must be "so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity." *Mitchell v. C.W. Vollmer & Co.*, 349 U.S. 427, 429 (1955). The employee carries the burden here. *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 120 (1946).

There are two ways for individual coverage to attach: the employee must either be "engaged in commerce" itself, or she must engage "in the production of goods for commerce." 29 U.S.C. § 206(a). The second method is characterized by activities such "as repairing and maintaining interstate roads, railroads, and telephone lines," *Joles v. Johnson Cnty. Youth Serv. Bureau, Inc.*, 885 F. Supp. 1169, 1178 (S.D. Ind. 1995), and neither Ms. Mays nor Ms. Malmquist argue this. They instead say their work falls under the first classification, satisfied by the "regular and recurrent use of interstate telephone, telegraph, mails, or travel." *Id.*

The internet is an instrumentality of interstate commerce, *United States v. Chaparro*, 956 F.3d 462, 470 (7th Cir. 2020), and these performers cite to it as the basis for individual coverage here. The use must be "regular and recurr[ent]." 29 C.F.R. § 776.3; *Shoemaker v. Lake Arbutus Pavilion, LLC*, 115 F. Supp.3d 974, 980 (W.D. Wis. 2015). Recurrent means "[o]ccurring or appearing several times; happening repeatedly,"[3] and "regular" means "recurring or taking place repeatedly at (short) uniform intervals; characterized by repetition of this sort."[4] Ms. Mays and Ms. Malmquist both rely on the internet streaming music services provided by a DJ and jukebox at Danzers and social media

---

[3] *Recurrent*, Black's Law Dictionary (11th ed. 2019).

[4] *Regular*, Oxford English Dictionary, https://www.oed.com/view/Entry/161414?redirectedFrom=regular#eid (last visited Mar. 8, 2021).

advertising by fellow employees to satisfy this standard, and Ms. Mays additionally relies on her text messaging of clientele.

Ms. Mays' text messaging doesn't satisfy individual coverage on this record, even if viewed in conjunction with the other instances of her use of interstate commerce. She didn't specify how often she texted clients across state lines regarding her performances at Danzers (Tr. 34). She didn't clarify whether her text messages were sent to clients arising from her time at Danzers (ECF 46-4 ¶ 20), which is especially suspect because she had worked at many other adult entertainment institutions and had only worked at Danzers for nine days, a time in which it would be difficult to accumulate a large client database. Ms. Mays conceded that she texted on her own initiative, without direction from Ms. Rubiano (Tr. 27, 33). Ms. Mays says she "regularly" texted clients, but this is a mere legal conclusion devoid of facts that will withstand summary judgment. *See Shoemaker*, 115 F. Supp.3d at 980 (plaintiffs' claim that they "regularly" used the internet and texting, without evidence supporting that statement, was insufficient to establish individual coverage at summary judgment); *see also Hadley v. Du Page Cnty.*, 715 F.2d 1238, 1243 (7th Cir. 1983) (Rule 56 "requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted"). Ms. Mays relies on other employees' use of texting and social media advertising to establish individual coverage, but again the court looks only to her use of services—the employee in question. *See Mitchell*, 358 U.S. at 211.

The performers here properly conceded at oral argument that individual coverage hinged solely on whether their dancing to music streamed online by the DJ and jukebox qualified as regular and recurrent use of interstate commerce (Tr. 34).[5] Streaming refers to the "transfer of video and audio material over a network (now *esp.* the internet) or (less commonly) from a disk as a continuous,

---

[5] The court denies Rubiano's motion to strike Ms. Mays' statements regarding Danzers' streaming services (*see* ECF 54 at 14). Ms. Mays says she personally observed Rubiano playing music streamed over the internet through YouTube (ECF 59 at 10). Moreover, the company admitted that the music was streamed online and that they subscribed to Napster and Rhapsody for online music streaming (ECF 46-18 at 7).

real-time stream of data."[6] Streaming music over the internet can be use of an instrumentality of interstate commerce. *See Chaparro*, 956 F.3d at 470. That said, neither Ms. Mays nor Ms. Malmquist ever show that they utilized the internet streaming services themselves, let alone that their use was regular and recurrent. The record only specifies that the DJ streamed music online and that customers and employees generally streamed music through the jukebox via an online app (ECF 46-4 ¶ 19). Because neither Ms. Mays nor Ms. Malmquist show that they individually utilized an instrumentality of interstate commerce, individual coverage doesn't attach. *See Smith v. Nov. Bar N Grill LLC*, 441 F. Supp.3d 830, 838 (D. Ariz. 2020); *see also Mitchell*, 358 U.S. at 211 (focus on the activities of the individual employee).

Ms. Mays and Ms. Malmquist counter by arguing that they regularly and recurrently used the internet because they danced to music that was streamed online, even if others were the ones doing the streaming. They cite to two out-of-circuit, unpublished opinions that say likewise. *See Miller v. Centerfold Ent. Club, Inc.*, 2017 U.S. Dist. LEXIS 125945, 8-10 (W.D. Ark. Aug. 9, 2017); *Foster v. Gold & Silver Priv. Club, Inc.*, 2015 U.S. Dist. LEXIS 165217, 14-16 (W.D. Va. Dec. 8, 2015). These cases are distinguishable because the performers in those cases chose the music that was streamed online themselves. *Miller*, 2017 U.S. Dist. LEXIS 125945 at 9; *Foster*, 2015 U.S. Dist. LEXIS 165217 at 15-16. In contrast, neither Ms. Mays nor Ms. Malmquist provide evidence that they downloaded the operating app, chose the music here, or executed the streaming. To find individual coverage on such an attenuated showing would effectively bring every employee within FLSA's purview, which the Supreme Court has cautioned against, because almost every business today utilizes the internet in some way. *See Maneja v. Waialua Agr. Co.*, 349 U.S. 254, 272 (1955). Neither Ms. Mays nor Ms. Malmquist are individually covered under FLSA.

---

[6] *Streaming*, Oxford English Dictionary, https://www.oed.com/view/Entry/191407?rskey=zT8lpE&result=2&isAdvanced=false#eid (last visited Mar. 8, 2021).

       3.    *The Company Isn't Covered Under FLSA's Enterprise Coverage.*

Enterprise coverage occurs when an employee is "employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a). For it to apply, the business must (1) have employees engaged in commerce and (2) have an annual gross volume of sales made or business done of at least $500,000. 29 U.S.C. § 203(s)(1)(A). Though it implicates factual questions, the annual revenue requirement is a question of law for the court. *Hicks v. Avery Drei, LLC*, 654 F.3d 739, 747 (7th Cir. 2011). The court may rely on a business's income tax returns. *See, e.g., Jacoby v. Schimka Auto Wreckers, Inc.*, 2010 U.S. Dist. LEXIS 81586, 5 (N.D. Ill. Aug. 11, 2010). Rubiano, Inc. submitted its income tax returns, which said its gross volume of sales for 2016 and 2017 were $448,766.50 and $453,548.12 respectively (ECF 46-3). These amounts fall below the threshold.

The tax returns alone aren't dispositive. Ms. Mays says the tax returns aren't credible (*see* ECF 46-4 ¶ 14). She says the company failed to report income it received from walk-in dancers for DJ fees ($12,000-$20,800), house fees ($10,770.84-$36,400.00), and private dance fees ($54,000.00-$132,000.00) (*see* ECF 46-4 ¶¶ 7-13). These allegations are mere speculation and don't defeat summary judgment. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003).

Ms. Mays only worked at Danzers for nine days. She didn't manage the club's finances or handle its taxes. She has little, if any, understanding of how Rubiano, Inc.'s business works over the course of an entire year. As a walk-in dancer, she picked the nine days she worked, which presumably would be days she believed she could make the most money. There is no basis to believe each day of the year mimics her limited experience at Danzers. Ms. Mays doesn't back up her allegations with expert witnesses qualified to opine on the issue, or any real personal knowledge.

Ms. Mays' math is speculative at best. She bases her allegations on her belief that the company had at least ten walk-in dancers year-round, but she has no basis for knowing that based on a mere nine days of work. Her math assumes at times that walk-in dancers would work every single day of

the year, which is conjecture. She estimates the amount of time other dancers would work, but again her estimates lack personal knowledge. She discusses a "glitch" that Ms. Rubiano admitted to regarding rental fees (*see* Tr. 40), but she presents no real evidence as to what the right number for that glitch should be or whether any other supposed glitches would weigh in favor of a higher annual income. Ms. Mays conceded at oral argument that she didn't know what the exact numbers for the business' annual income should be (Tr. 41). This circuit has discredited similar speculative allegations regarding gross revenues before. *See Hicks*, 654 F.3d at 747. On this record, neither Ms. Mays nor Ms. Malmquist show that Rubiano, Inc. is covered under enterprise coverage. Because neither Ms. Mays nor Ms. Malmquist are individually covered under FLSA, and because Rubiano, Inc. is not covered under enterprise coverage, the FLSA wage claims fail. The court enters summary judgment accordingly.

      B.      *The Court Denies Summary Judgment as to Ms. Mays' Retaliation Claim But Grants Summary Judgment as to Ms. Malmquist's Retaliation Claim.*

FLSA makes it unlawful for a person "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [FLSA]." 29 U.S.C. § 215(a)(3). This statute applies to persons even if they are not covered under the wage statute, as here. *See Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999). To establish FLSA retaliation liability, a plaintiff must prove that (1) she engaged in protected activity; (2) suffered an adverse employment action; and (3) that a causal link existed between the protected expression and adverse action. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). Both Ms. Mays and Ms. Malmquist assert FLSA retaliation claims.

      1.      *The Court Denies Summary Judgment on Ms. Mays' Retaliation Claim.*

The issue for Ms. Mays is whether the company retaliated against her after Ms. Rubiano found out that Ms. Mays had sued previous employers for FLSA violations while she was employed at those institutions. The parties cite no cases addressing this issue of law—whether a subsequent employer can retaliate for protected activity that occurred with a former employer.

11

The court begins with the statute's plain meaning. *Sebelius v. Cloer*, 569 U.S. 369, 381 (2013). FLSA says the employer violates the law if the employer "discharge[s]" an employee "because [the] employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [FLSA]." 29 U.S.C. § 215(a)(3). The statute doesn't specify when and against whom FLSA activity must have occurred; instead, it says only that the employee must have engaged in FLSA-protected activity, and that the employee was discharged for engaging in that protected activity. An employee who exercises her right to complain about wage violations under FLSA with one employer and who then suffers an adverse action, for instance termination, at the hands of a subsequent employer because of her protected activity can sue that subsequent employer for retaliation. One might think that "retaliation" presupposes an adverse action because of protected activity against one and the same employer that retaliates, but the statute doesn't use the word "retaliation" or describe relief only in these terms. This interpretation comports with the statute's plain language, not to mention its broad remedial purpose. *See Hoffman-La Roche v. Sperling*, 493 U.S. 165, 173 (1989) ("The broad remedial goal of [FLSA] should be enforced to the full extent of its terms.").

Ms. Mays engaged in a protected activity by filing FLSA complaints with previous employers. Ms. Rubiano terminated Ms. Mays, and a jury could reasonably conclude she did so because Ms. Mays had filed previous FLSA complaints. Before terminating Ms. Mays, the company ran a background check on her, which included calling adult entertainment institutions that Ms. Mays had sued. The company says it had determined to fire Ms. Mays because of her violation of rules, but if true then there was no need to run a background check or to assess her past lawsuits. Ms. Rubiano discovered approximately ten class action lawsuits Ms. Mays had filed. When the company terminated Ms. Mays, Ms. Rubiano told her she had sued lots of clubs in the past, saying it was crazy and unbelievable. She told Ms. Mays to backtrack and think about what she was doing because filing lawsuits was dangerous. She warned Ms. Mays that there were people out there who hurt people who file lawsuits. Moreover,

Ms. Rubiano told Ms. Malmquist that she was talking to the wrong person (meaning Ms. Mays) and would be fired for affiliating with her because she had the reputation of suing clubs. Ms. Rubiano told Ms. Malmquist that she didn't want her to help Ms. Mays with a case against them by either filing, participating, or testifying in a lawsuit. The statements create a genuine triable issue regarding the cause for Ms. Mays' termination.

Ms. Rubiano argues that she terminated Ms. Mays because Ms. Mays wasn't meeting her work expectations. Ms. Mays admitted she broke the club's rules including chewing gum, drinking on the job, and talking on her phone while on the floor after being asked to stop, and she knew breaking these rules could lead to her termination. Ms. Rubiano says Ms. Mays was also rude to customers and staff and said she was involved in an incident where a customer complained about her putting a belt around his neck.

While possibly justifying termination, a jury could also reasonably believe these alleged justifications are pretextual. *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005). To establish pretext, the plaintiff must "show that the employer's stated reason for an employment action is dishonest and that the true reason was based on" protected reasons. *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009) (Title VII case). If rule violations were the sole basis for termination, then there was no need to conduct a background search or to discuss the concerns about Ms. Mays' exercise of rights protected by law. Given Ms. Rubiano's background search of Ms. Mays and her subsequent statements to both Ms. Mays and Ms. Malmquist expressing her displeasure with the class action suits Ms. Mays had filed, a jury could find Ms. Rubiano's after-the-fact justifications to be dishonest. *See Sanchez v. Henderson*, 188 F.3d 470, 476 (7th Cir. 1999) (plaintiff may also establish pretext with evidence suggesting retaliation "was the most likely motive for the termination"). The court denies the summary judgment motion on Ms. Mays' retaliation claim.

        2.       *The Court Grants Summary Judgment on Ms. Malmquist's Retaliation Claim.*

The issue for Ms. Malmquist is whether the company retaliated against her within the meaning of FLSA when it terminated her for its mistaken belief that she had engaged in FLSA-protected activity, when in fact she hadn't. The court again looks at the statute's plain meaning. *Sebelius*, 569 U.S. at 381. FLSA makes it illegal to "discharge" an "employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [FLSA], or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). Ms. Malmquist concedes that she hadn't engaged in FLSA-protected activity, or that she was about to engage in FLSA-protected activity, as outlined in the statute when she was terminated. Accordingly, her claim fails under the plain meaning of the statute and this circuit's requirement that a plaintiff engage in protected activity for there to be retaliation. *See Kasten*, 703 F.3d at 972.

Ms. Malmquist advances a "mistaken belief" retaliation theory adopted by *Brock v. Richardson*, 812 F.2d 121 (3d Cir. 1987). The Third Circuit held that the discharge of an employee based on a mistaken belief by the employer that the employee had engaged in protected FLSA activity, when in fact the employee hadn't, gave rise to a retaliation claim under FLSA. *Brock*, 812 F.2d at 125. In doing so, the court relied on the "animating spirit" of FLSA. *Id.* at 124. The court here declines to follow *Brock* because the statute's plain wording requires some type of FLSA-protected activity, *see* 29 U.S.C. § 215(a)(3), and Ms. Malmquist concedes she hasn't done that. The court leaves the animating spirit to Congress. The court grants summary judgment against Ms. Malmquist on her retaliation claim.

        C.       *The Court Grants Summary Judgment Against Ms. Mays on her Blacklisting Claim.*

Indiana's blacklisting law provides that "[a] person who, after having discharged any employee from his service, prevents the discharged employee from obtaining employment with any other person" commits a civil infraction and is liable for damages. Ind. Code § 22-5-3-1(a), *see also* Ind. Code

§ 22-5-3-2; *Sch. City of Hammond Dist. v. Rueth*, 71 N.E.3d 33, 44-45 (Ind. Ct. App. 2017). Ms. Mays says Ms. Rubiano blacklisted her by calling other entertainment clubs and telling them to not hire her.

Her claim fails for two reasons. First, she admitted she had no evidence that Ms. Rubiano talked to any clubs about her and said only that other clubs' responses suggested that Ms. Rubiano had spoken with the clubs. Her mere speculation won't survive summary judgment. *McCoy*, 341 F.3d at 604. Second, even if Ms. Rubiano had talked to other clubs about her, there is no evidence that she said anything false. *See* Ind. Code §§ 22-5-3-1(a) ("this subsection does not prohibit a person from informing, in writing, any other person to whom the discharged employee has applied for employment a truthful statement of the reasons for the discharge"); 22-5-3-1(b) ("An employer that discloses information about a current or former employee is immune from civil liability for the disclosure and the consequences proximately caused by the disclosure, unless it is proven by a preponderance of the evidence that the information disclosed was known to be false at the time the disclosure was made."). Ms. Mays' unsupported statement that it is rare for a dancer to be declined the opportunity to dance at an adult entertainment establishment doesn't establish any genuine dispute of material fact for trial. The jury would be invited merely to speculate. The court grants summary judgment on Ms. Mays' blacklisting claim.

    D.    *The Court Denies the Performers' Motion for Conditional Certification.*

Ms. Mays and Ms. Malmquist move for conditional certification of a class to recover unpaid wages under 29 U.S.C. § 216(b) (ECF 24). The court denies this motion as moot because it grants summary judgment in favor of defendants on the FLSA claim.

## CONCLUSION

The court GRANTS IN PART and DENIES IN PART Rubiano, Inc.'s and Sharon Rubiano's summary judgment motion (ECF 34), leaving only Elizabeth Mays' retaliation claim under FLSA against both Rubiano, Inc. and Ms. Rubiano for trial. The court DENIES AS MOOT Elizabeth Mays'

and Alessandra Malmquist's motion for conditional certification of a class (ECF 24). The court DIRECTS the clerk to terminate Alessandra Malmquist as a plaintiff.

SO ORDERED.

March 9, 2021                              *s/ Damon R. Leichty*
                                           Judge, United States District Court